IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 1, 2011

**STATE OF TENNESSEE v. WILLIE HAMPTON**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-06850     W. Mark Ward, Judge**

---

**No. W2010-01603-CCA-R3-CD  - Filed August 17, 2011**

---

A Shelby County jury convicted the Defendant-Appellant, Willie Hampton, of theft of property in excess of $10,000, a Class C felony. The Defendant-Appellant was sentenced as a Range III, persistent offender, to a term of fifteen years imprisonment in the Tennessee Department of Correction. In this appeal, the sole issue presented for our review is whether the evidence presented at trial was sufficient to support the Defendant-Appellant's conviction of theft over $10,000. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Robert W. Jones, District Public Defender; Michael Johnson, Assistant Public Defender, Memphis, Tennessee, for the Defendant-Appellant, Willie Hampton.

Robert E. Cooper, Jr., Attorney General and Reporter; , Assistant Attorney General; Rachel Willis; Amy P. Weirich, District Attorney General; and Anita Spinetta, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Trial.** This is a case in which the victim, Margaret Elbert Biggs, age 60, was deceived into giving the Defendant-Appellant, a frequent customer of the victim's video store, over $10,000 in cash and a pickup truck. In April or May of 2008, the Defendant-Appellant visited Biggs at her new business, Biggs General Contracting, a scrap metal company in Millington, Tennessee. Biggs was surprised to see the Defendant-Appellant because she had not seen him since she had closed her video stores, some eight years earlier. She stated,

He was just so happy to see me and of course he was joking around, kept us laughing and told me that he worked for – was the manager of a big tire company in West Memphis, because I had invited him on into the office and I think two of my employees were in there and he was telling me that they were doing a big inventory on tires. They was having their big inventory and that he could get me some tires at a really good price.

Biggs said the Defendant-Appellant asked her how many tires she needed, and she jokingly responded "thirty or forty." She testified that she did not intend to buy any tires from the Defendant-Appellant. However, a few days later, the Defendant-Appellant approached her again about the tires and said he needed "cash money." At that point, Biggs told him she would "have to pay by check, get an invoice. [She] asked him if he was stealing those tires." The Defendant-Appellant was in tears and told her "that he was going to have to do something, because he had a lot of bills that he was behind on."

Some days later, Biggs received a telephone call from a "Sergeant Hill", who said he was with law enforcement. "Sergeant Hill" told Biggs that she was going to be arrested because of her involvement with some "tires." She responded that she did not buy any tires, and was then told that it was on "tape where [she] had told him [she would] take so many." She replied, "if you was taping it then you'll know what I told him, that I wouldn't buy them." She testified that "Sergeant Hill" called again and "asked for her help in catching them. That they had the tires at someplace in Memphis and he needed [her] to call [the Defendant-Appellant] and tell him that [she] would take the tires."

She did not recognize the voice of "Sergeant Hill" as that of the Defendant-Appellant. She called the Defendant-Appellant and told him she would take the tires. The Defendant-Appellant then told her that he needed $2,500 cash. The Defendant-Appellant explained that another individual had the tires in storage and he could not get the tires out of storage without paying him a $2,500 storage fee. Biggs called "Sergeant Hill" back, and "Sergeant Hill" advised her to give the Defendant-Appellant the $2,500. "Sergeant Hill" told Biggs that she would be reimbursed for the money. Biggs later gave the Defendant-Appellant $2,500, in cash.

Biggs "heard a lot of sirens going down Thomas Street" and assumed the Defendant-Appellant and "that guy that was in cahoots with him" were arrested. Biggs said, about a week later, the Defendant-Appellant called her "from jail" and "put on a pitiful story and wanted [her] to loan him $1,500. . . . And his wife, or somebody, came by the office and picked up the $1,500." Biggs explained that she felt "bad" because the Defendant-Appellant was a customer of her video store and she helped to put him in jail.

Biggs testified that she later gave the Defendant-Appellant an additional $7500.00. She explained

> Sergeant Hill started calling me and they was going to arrest my husband, shut our business down because the Feds had been brought in on it and were coming out of Arkansas, out of West Memphis, Arkansas, into Tennessee. It was called trafficking, or something. I can't remember what Sergeant Hill told me. And he told me how sorry he felt for [the Defendant-Appellant] and he said that he was going to lose everything that he had and that he needed help on paying his bills and he told me that I should give him $15,000.00. And I told him that I couldn't give him $15,000.00. And I ended up giving $7500.00, because I just wanted it over. My husband is 70-something years old and he's a good man and I did not want him to know that I was so dumb to even tell him that I would buy tires and then tell him that I was only kidding with him.

Biggs thought it was "over", but she said "[t]hey kept on until I gave them my old blue pickup truck." "Sergeant Hill" called her again and told her that they "felt for [the Defendant-Appellant]" and they found him a job delivering papers. She was told that he could not have the job because his vehicle had been confiscated. Consequently, Biggs said she gave the Defendant-Appellant her Dodge Dakota pickup truck, which was valued at between $2,500 and $3,000. Biggs never received any money from "Sergeant Hill" or the Defendant-Appellant. She also never received her pickup truck.

Six months after Biggs's last contact with the Defendant-Appellant, Leonard Biggs, Biggs's husband, received a phone call regarding an investigation of stolen tires. He testified that he became aware of his wife's giving the Defendant-Appellant money in July of 2008. He said:

> I got a phone call early one morning, this guy identified himself as a police officer, who told me that my wife was buying stolen property, or something to that effect and that he was going to lock her up, or something, if we didn't give him this such amount of money and this and that. And I told him, okay. And so, it just kind of rung a little bell when he done that, because I knew that I didn't buy stolen property. I have a scrap yard here on Thomas and I knew that wasn't right.

The caller identified himself as "Sergeant Hill" with the Memphis Police Department. Immediately following the call, Mr. Biggs went to the organized crime unit with the Memphis Police Department and they began to investigate the case.

Mary Dailey, the victim's sister, testified that she was present with the victim each time the victim gave the Defendant-Appellant money. Dailey was with her sister when she gave the Defendant-Appellant $7,500, in May of 2008. She said the Defendant-Appellant was crying and "had a lot of problems." Dailey said that she was also with her sister when she gave the Defendant-Appellant the title to her pickup truck. Dailey was also present when a female came to the victim's office and picked up $1,500 for the Defendant-Appellant.

Mike Shearin, of the Memphis Police Department's Organized Crime Unit ("O.C.U."), testified that April through July of 2008, the duration of the instant offense, there was no "Sergeant Hill" employed in the O.C.U. He also confirmed that the Defendant-Appellant was not working with the O.C.U. during that time. He said that O.C.U. does not ask public citizens to donate money to assist in investigations or to make donations to assist defendants to be released on bond.

Lieutenant Dale Hensley of the Memphis Police Department testified that he investigated the instant case. He retrieved Mr. Biggs's telephone, obtained the phone number of the person who called him regarding the stolen tires, and traced it to the Defendant-Appellant and his wife. The Defendant-Appellant was later given his Miranda rights, which he waived, and then provided an oral statement. Lieutenant Hensley recalled:

> [H]e thought that we wanted to question him about Ms. Margaret Biggs and his sister, trying to say that he was doing something. We told him that it was about a woman named Margaret, but we didn't know anything about his sister. But, we asked him if he had called Mr. Biggs that morning and he stated that he had. And when I asked him why he pretended to be a police officer, he denied doing that. And I also asked him about the monies that he had received from Ms. Biggs and he denied ever receiving any money from Ms. Biggs.
>
> And, I asked him about the truck and why he had had that truck from her and he said he [sic] gave it to her [sic] for transportation. And I asked him why he didn't get it signed into his own name and he said, he put it in his wife's name, because he couldn't have anything in his name, because of being on probation.
>
> . . . .

-4-

He did, however state, that he had all of his conversations with Ms. Biggs on tape and that if it came to the point that it had to come to trial, he would produce the tapes. So I repeatedly tried to get him to get me the tapes, or at least let me listen to them and told him that if the tapes proved that he did nothing wrong, that we wouldn't even put him in jail[.]

The Defendant-Appellant never provided the tapes to Lieutenant Hensley. Lieutenant Hensley confirmed that (1) there was no "Sergeant Hill" employed with the Memphis Police Department O.C.U., (2) there was no evidence that Ms. Biggs was investigated for buying stolen tires, and (3) there was no evidence that the Defendant-Appellant was arrested for involvement in a stolen tire ring, as Ms. Biggs was led to believe.

Based on the above proof, the Defendant-Appellant was convicted as charged and sentenced to a term of imprisonment of fifteen years in the Tennessee Department of Correction. He filed a timely notice of appeal, and the instant appeal followed.

## ANALYSIS

The Defendant-Appellant does not contest the evidence as presented at trial. Instead, he argues that he did not commit theft because the victim voluntarily gave him her money and property. Consequently, he contends that he had the owner's effective consent, and therefore, the evidence did not sufficiently support the elements of the offense of theft. The State contends that "under any definition of 'deception' found in the Tennessee Criminal Code, the evidence in this case shows that the defendant engaged in a skillful and systematic course of theft by deception[.]" The State maintains the evidence supports the Defendant-Appellant's conviction for theft of property over $10,000. We agree with the State.

The standard of review for challenges to the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original) (citation omitted); Tenn. R. App. P. 13(e); State v. Winters, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003) (citations omitted). This court does not re-weigh the evidence or substitute its inferences for those drawn by the trier of fact. Winters, 137 S.W.3d at 655 (citations omitted). All factual issues raised by the evidence, questions concerning the credibility of the witnesses, and the weight and value of the evidence have been resolved by the trier of fact. Id. (citation omitted). This court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Cabbage, 571 S.W.2d

832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T. C. A. § 39-14-103. Therefore, in order to obtain a theft conviction, the State must establish that "(1) the defendant knowingly obtained or exercised control over property; (2) the defendant did not have the owner's effective consent; and (3) the defendant intended to deprive the owner of the property." State v. Amanns, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). "'Effective consent' means assent in fact, whether express or apparent, including assent by one legally authorized to act for another." T.C.A. § 39-11-106(a)(9). Consent is not effective when:

> (A) Induced by deception or coercion;
>
> (B) Given by a person the defendant knows is not authorized to act as an agent;
>
> (C) Given by a person who, by reason of youth, mental disease or defect, or intoxication, is known by the defendant to be unable to make reasonable decisions regarding the subject matter; or
>
> (D) Given solely to detect the commission of an offense;

T.C.A. §39-11-106 (9).

Under our criminal code, "deception" means that a person knowingly:

> (i) Creates or reinforces a false impression by words or conduct, including false impressions of fact, law, value or intention or other state of mind that the person does not believe to be true;
>
> (ii) Prevents another from acquiring information which would likely affect the other's judgment in the transaction;
>
> (iii) Fails to correct a false impression of law or fact the person knows to be false and:
>
> (a) The person created; or

(b) Knows is likely to influence another;

. . . .

(v) Employs any other scheme to defraud; or

(vi)(a) Promises performance that at the time the person knew the person did not have the ability to perform or that the person does not intend to perform or knows will not be performed, except mere failure to perform is insufficient to establish that the person did not intend to perform or knew the promise would not be performed[.]

T.C.A. §39-11-106 (a)(6)(A). When reviewing whether a defendant had "effective consent" in theft offenses, this Court recognizes that "[t]he jury observed the witnesses and heard the testimony. Therefore, the jurors were in the best position to make determinations as to whether the defendant had effective consent." See State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App.1996); State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984).

We conclude that a rational jury could have weighed the credibility of the victim and determined that the Defendant-Appellant, through his phone calls, "Sergeant Hill", and threats to have the victim and her husband arrested, deceived the victim into giving him her money and property. Our review of the record shows that the evidence adduced at trial more than sufficiently supports the conviction in this case, and the Defendant-Appellant is not entitled to relief.

## CONCLUSION

Upon our review, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE